IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.        No. CR 16-02367 WJ

JULIO CESAR FIGUEROA-RIVERA,

    Defendant.

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

THIS MATTER comes before the Court upon Defendant Julio Cesar Figueroa-Rivera's Motion to Suppress (**Doc. 28**), filed on August 16, 2016. Having considered the parties' written and oral arguments, the testimony and evidence presented at the suppression hearing on October 14, 2016, and the applicable law, the Court finds that Defendant's Motion is not well-taken and, therefore, is **DENIED**.

### BACKGROUND

On March 23, 2016 at approximately 8:22 a.m., Defendant Julio Cesar Figueroa-Rivera ("Mr. Figueroa-Rivera" or "Defendant") was driving westbound on Interstate-40 near Albuquerque when he was pulled over for an unsafe lane change by Bernalillo County Sheriff Deputy Leonard Armijo. Deputy Armijo saw Mr. Figueroa-Rivera make an abrupt lane change directly in front of another vehicle, and the driver had to suddenly brake in order to avoid colliding with Defendant's vehicle. After Deputy Armijo stopped Defendant, he noticed temporary Colorado registration tag improperly displayed on the rear of Defendant's vehicle, a

silver 2008 Honda Accord. Deputy Armijo observed that the temporary tag was mounted over a metal license plate and was attached with three screws. Deputy Armijo immediately found this suspicious because in his experience, such plates are used by individuals who want to move in and out of states easily because they can be quickly switched from front to back.

Deputy Armijo thought the temporary Colorado tag was unlawful based on his understanding of New Mexico law, which provides that a temporary registration tag cannot be valid beyond thirty days. Defendant's temporary tag was valid beyond thirty days, with an expiration date of May 21, 2016.[1] The temporary registration was mounted on top of a metal license plate. The vehicle was insured out of Colorado, effective February 11, 2016.

Deputy Armijo asked Defendant for his driver's license, registration, and insurance card. Deputy Armijo noticed Mr. Figueroa-Rivera was extremely nervous and fidgety, his hands were trembling, he would not make eye contact, and he was cotton-mouthed. Notably, Mr. Figueroa-Rivera's nervousness did not dissipate at any point. Deputy Armijo testified this was unusual because, although it is common for the motoring public to be nervous when pulled over, nervousness usually disappears once the driver learns of the reason for the stop.

Mr. Figueroa-Rivera speaks Spanish. Throughout the duration of the stop, Deputy Armijo spoke to Defendant in Spanish. Deputy Armijo is certified bilingual through the Bernalillo County Sheriff's Department. There was no indication at any point during the traffic stop that Defendant was having trouble understanding Deputy Armijo.

Defendant's name was not listed on the insurance card. Deputy Armijo asked Mr.

---

[1] The United States acknowledges Deputy Armijo mistakenly believed that temporary registration tags are valid for only thirty days from the date of purchase. *See* NM Stat. Ann. 66-3-6 (2007) ("The temporary registration permit shall be valid for a period not to exceed thirty business days.") The parties agree that in Colorado, temporary plates are valid for up to sixty days. *See* 1 Colo. Code Regs. § 204-10:34 (2012) ("[T]emporary permit may not exceed sixty (60) days from the date of sale/issuance."). However, Deputy Armijo determined that under Colorado law the temporary tag was nonetheless unlawful because it expired on a Saturday. *Id.*

Figueroa-Rivera questions about the vehicle's insurance and ownership.  Mr. Figueroa-Rivera stated that the car was his and he had purchased it the day before.  Deputy Armijo found this odd because Mr. Figueroa-Rivera was not named on the insurance card, but instead an individual named Jose Aviles was listed on the card.  Defendant stated that he and Mr. Aviles were friends.  Deputy Armijo asked him why the vehicle was insured one month prior to his purchase of the vehicle, and Defendant could not provide a plausible explanation.  Deputy Armijo also found it unusual that the VIN number already appeared on the insurance card when the vehicle had only been purchased the day before.

Deputy Armijo next asked Defendant a number of questions about his travel plans.  Defendant stated that he departed from Denver immediately after purchasing the vehicle and procuring the auto insurance.  Deputy Armijo became suspicious because it was approximately 8:22 a.m., so Defendant would have left Denver around midnight.  It would be highly unusual for car dealerships and auto insurance carriers to be open for business around midnight.  Defendant's travel plans also seemed implausible.  He first told Deputy Armijo that he was driving to Mexico via Tucson.  Deputy Armijo found this odd given the indirect nature of the route.[2]  Defendant later told Deputy Armijo that he was driving first to Flagstaff because he wanted to visit an outlet shopping center there, but Deputy Armijo knew from personal experience that the outlet shopping center was in Phoenix and not  in or near Flagstaff.

Immediately upon stopping Mr. Figueroa-Rivera, Deputy Armijo noticed the rear end of the vehicle was hanging three to four inches lower than normal.  Deputy Armijo peered under the rear of the vehicle and noticed right away that it had been altered.  He saw fresh paint, and asked Defendant if he had any work done on the vehicle.  Defendant said there had been no work done

---

[2] Deputy Armijo testified that a more direct route to Tucson from Denver is to drive south on Interstate-25 to Las Cruces, and then to take Interstate-10 westbound to Tucson, rather than driving from Denver to Albuquerque, then Albuquerque westbound to Flagstaff, then south to Phoenix and then to Tucson.

3

and repeated that he had just bought the car.  Deputy Armijo testified that he found it suspicious that the exhaust system of a car would be hanging so low when it had been purchased only a day before from a dealer.

After this conversation, Deputy Armijo returned Defendant's license, registration, and insurance card, and issued a traffic citation for Improper Display of License Plate in violation of N.M. Stat. Ann. § 66-3-18 (1978) and a warning for the unsafe lane change.  As Defendant was walking back to his car, Deputy Armijo called out to the Defendant using his first name.  He called out "Julio" three times, because traffic on the side of Interstate-40 was noisy and Defendant could not initially hear him.  Deputy Armijo asked if he could speak with him further, to which Defendant responded, "Si."  In his Motion, Defendant states that at this point he did not feel free to leave because there were numerous law enforcement officers on the scene, and he felt compelled to answer the Deputy.  Defendant does not specify why he felt compelled to answer.  Deputy Armijo testified there was nothing coercive or confrontational about his tone.  He never had his weapon drawn, and was standing next to his vehicle while Mr. Figueroa-Rivera had walked back to his vehicle.

Deputy Armijo then asked Defendant if he was travelling with guns, drugs, or large amounts of cash.  According to the Government, Defendant hesitated only when answering "no" to the question about cash but not to the questions about guns or drugs.  Deputy Armijo testified that Defendant had been avoiding eye contact throughout these questions, but that he only made eye contact when answering "no" to the question about cash.  At this point, Defendant asked Deputy Armijo if he could leave, and Armijo told him he was free to leave and pointed to the Route 66 Casino, which was located only about 300 to 400 yards away.  Deputy Armijo told Defendant that he would be detaining Defendant's vehicle.

Deputy Armijo asked Defendant for permission to search the vehicle, and showed him a written consent form in Spanish.  Defendant declined a consensual search of the vehicle.  Deputy Armijo told him he was going to conduct a search of the vehicle using a Certified K-9 narcotics dog, and again stated to Defendant that he was free to leave.  Deputy Armijo's partner, Deputy Rael, deployed the dog to conduct an open-air sniff of Defendant's vehicle.  The dog alerted to the odor of narcotics at the rear of the vehicle.  Deputy Armijo again told Defendant he was free to leave, but he elected to stay.  Deputy Armijo inspected the rear underside of the vehicle again and immediately saw non-factory parts added to the undercarriage.  He noticed that the heat shields had been cut, and testified that heat shields are typically factory-made and not altered.  He told Defendant he was going to take the vehicle to a public works facility for inspection and, while Defendant had been told that he could leave the scene, Defendant asked to accompany the deputies with the vehicle to the facility.  Mr. Figueroa-Rivera accompanied the officers freely and was never restrained at any point.  At the public works facility, a more detailed inspection of the vehicle resulted in the discovery of six cellophane-wrapped bundles of U.S. currency (about $65,000) located in a hidden compartment under Mr. Figueroa-Rivera's vehicle.

A federal grand jury subsequently indicted Defendant on May 24, 2016, charging him with Misprision of a Felony, bulk cash smuggling, in violation of 18 U.S.C. § 4.  The Government's Complaint (Doc. 2) charges Defendant with violating 31 U.S.C. § 5332, bulk cash smuggling.

Mr. Figueroa-Rivera filed a Motion to Suppress (**Doc. 28**) on August 16, 2016.  The United States filed a Response (**Doc. 31**) on August 30, 2016, and Mr. Figueroa-Rivera filed a Reply (**Doc. 32**) on September 13, 2016.  The Court held a suppression hearing on October 14, 2016.

## LEGAL STANDARDS

A district court cannot suppress evidence unless the movant proves that a search implicates Fourth Amendment interests. *See United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995). The Fourth Amendment protects individuals from unreasonable searches and seizures by the government. *See United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992). A routine traffic stop is a seizure under the Fourth Amendment. *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015). Courts conduct a two-step analysis in determining whether a traffic stop is constitutional. "[A] traffic stop is reasonable if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007)).

"[A] traffic stop may be expanded beyond its initial purpose if the traffic stop has become a consensual encounter, or if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. *Moore*, 795 F.3d at 1229 (internal citation and quotation marks omitted). "While a completed traffic stop can evolve into a consensual encounter between a citizen and a trooper, it can only do so if a reasonable person in the same circumstances would feel free to decline to answer the trooper's questions and leave." *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1304 (10th Cir. 2006). "Whether a defendant's consent to search his vehicle was voluntary is a question of fact, and the court considers the totality of the circumstances in making this determination. The government bears the burden of proof on this issue, and must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *United States v. Carbajal-Iriarte*, 586 F.3d 795, 799 (10th Cir. 2009) (internal citation and quotation marks omitted).

"Whether an investigative detention is supported by reasonable suspicion does not depend upon any one factor, but on the totality of the circumstances. For reasonable suspicion to exist, an officer must articulate something more than an inchoate and unparticularized suspicion or hunch." *Moore*, 795 F.3d at 1229 (internal citation and quotation marks omitted). Reasonable suspicion is not an onerous standard to satisfy. *Id.* at 1231.

## DISCUSSION

Defendant makes two principal arguments in support of his Motion to Suppress. The Court addresses each argument in turn.

### I.     The Traffic Stop Was Constitutional

Mr. Figueroa-Rivera argues Deputy Armijo unlawfully extended the traffic stop based on a mistake of law, and that the Court should suppress all evidence seized as a result of the encounter. The Court denies the Motion to Suppress because the traffic stop was constitutionally valid and reasonable in scope.

#### a. <u>The Initial Traffic Stop Was Lawful Because Deputy Armijo Observed a Traffic Violation</u>

The Court finds the traffic stop was constitutional because Deputy Armijo saw Mr. Figueroa-Rivera violate a New Mexico traffic regulation, N.M. Stat. Ann. § 66-7-317. Defendant claims the traffic stop was unconstitutional because it was based on Deputy Armijo's mistake of Colorado law regarding temporary tags.[3] *See United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004). The Court is not convinced. A traffic stop is valid if supported by reasonable suspicion that a traffic violation has occurred, or if the officer witnesses a traffic

---

[3] Even in *DeGasso*, which Defendant cites to support his proposition that Deputy Armijo's mistake of law rendered the traffic stop unconstitutional, the Tenth Circuit affirmed the district court's finding that a second reason for the stop supported reasonable suspicion. 369 F.3d at 1149. It simply does not matter if Mr. Figueroa-Rivera *actually* violated the statute. Deputy Armijo could have reasonably believed that Mr. Figueroa-Rivera made an unsafe lane change in violation of the law by changing lanes directly in front of another vehicle causing the other driver to suddenly brake.

violation. *Moore*, 795 F.3d at 1228. Armijo observed Mr. Figueroa-Rivera change lanes directly in front of another vehicle, and the driver had to brake in order to avoid colliding with Defendant's vehicle. As the United States appropriately notes, the problem with Defendant's argument is that he fails to acknowledge that Armijo's second basis for the stop was Defendant's improper lane change. Armijo testified that he observed Defendant change lanes directly in front of another driver, and the driver had to brake in order to avoid colliding with Defendant's vehicle. Section 66-7-317 provides in pertinent part, "Whenever any roadway has been divided into two or more clearly marked lanes … a vehicle … shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Deputy Armijo thus had an objectively reasonable suspicion to stop Mr. Figueroa-Rivera for violating New Mexico traffic law.

Neither party cited *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014), where the Supreme Court of the United States held for the first time held that a reasonable mistake of law may support reasonable suspicion justifying a traffic stop.[4] Chief Justice Roberts explained, "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground." Therefore, even if Armijo's traffic stop was exclusively based on his misapprehension of Colorado law regarding temporary tags, the mistake of law alone could provide a constitutional basis for the stop under *Heien*.

The Court concludes that even if the traffic stop was exclusively based on Deputy Armijo's misapprehension of Colorado law, which it was not, the mistake nonetheless provides a

---

[4] During closing arguments at the suppression hearing on October 14, 2016, the Court informed the parties of the Supreme Court's holding in *Heien* that a reasonable mistake of law may provide the basis for a valid traffic stop. The Court ordered the parties to submit supplemental briefing in light of the Supreme Court's holding in *Heien*. The parties submitted their supplemental briefing on October 21, 2016 (Docs. 36 and 37).

lawful basis for the stop. Deputy Armijo, a New Mexico law enforcement official, reasonably viewed the temporary tags based on his understanding of New Mexico law regarding such tags. As the United States correctly notes in its supplemental brief, Deputy Armijo "is a seasoned officer with many years of service. He has conducted thousands of traffic stops and he believed, as under New Mexico law, Defendant's temporary plate was valid for only thirty days." Deputy Armijo's mistaken belief about the length of time temporary tags are valid under Colorado law is exactly the type of mistaken belief on an issue of law that Chief Justice Roberts addressed in the *Heien* opinion.

      b. The Traffic Stop Was Reasonable In Scope

Defendant next argues Deputy Armijo's questioning regarding the temporary registration tag, Defendant's travel plans, and the purchase of the vehicle unlawfully extended the stop. The United States counters that Deputy Armijo did not unreasonably delay the traffic stop because officers may ask about travel plans and ownership during a lawful stop. The Court agrees with the United States that the stop was reasonable in scope. The initial stop until Deputy Armijo issued the traffic citations spanned less than fifteen minutes. There is nothing excessive about this length of time. Moreover, the United States correctly points out that an officer may routinely ask about travel plans and ownership of the vehicle during a lawful traffic stop. Indeed, "[t]he detention arising from a traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided those questions do not unreasonably extend the amount of time the subject is delayed." *United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2007). Questioning, *regardless of topic*, does not violate the Fourth Amendment when it does not unreasonably extend the amount of time the driver is delayed. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006).

The further questioning here was reasonable, even if it was unrelated to the initial

purpose of the stop. Deputy Armijo asked routine questions, such as where Defendant was headed, when he purchased the car, and why he was not listed on the insurance card. The time from the initial stop until Deputy Armijo issued the citation lasted only thirteen minutes and nineteen seconds. Deputy Armijo's questions, even those that were not limited to travel plans and insurance, "did not appreciably lengthen the detention and therefore the Fourth Amendment requires no justification." *See id.* The Court finds Deputy Armijo did not unreasonably extend the stop. Defendant makes a bare assertion in his Motion that his detention was "extremely intrusive," but he does not satisfy his burden of establishing Deputy Armijo violated his Fourth Amendment right to be free from an unreasonable seizure.

> **II.     The Post-Citation Detention Was Constitutionally Sound Because It Was Consensual and Supported by Reasonable Suspicion**

The Court finds Mr. Figueroa-Rivera consented to Deputy Armijo's further questioning after the initial purpose of the stop was completed, and even if Mr. Figueroa-Rivera did not consent, the continued detention was supported by reasonable suspicion.

> a. <u>Mr. Figueroa-Rivera Consented to Further Questioning</u>

Defendant argues Deputy Armijo's continued questioning was unconstitutional because the Deputy lacked consent. The Court disagrees.

Once an encounter becomes consensual, "[a]dditional questioning unrelated to [a] traffic stop is permissible." *United States v. Manjarrez*, 348 F.3d 881 (10th Cir. 2003) (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)). "A consensual encounter is not a seizure for purposes of the Fourth Amendment." *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005). The government bears the burden of proof on this issue, and must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *Carbajal-Iriarte*, 586 F.3d at 799

(internal citation and quotation marks omitted). A traffic stop encounter is not consensual unless the driver's documents have been returned. *Guerrero-Espinoza*, 462 F.3d at 1309.

Defendant has not pointed to any indication of coercion or overbearing conduct. The United States highlights that only two officers were initially present and neither was coercive. Moreover, the Court finds the testimony of Deputy Armijo to be very credible and he testified that he never displayed his weapon and never raised his voice. Deputy Armijo is fluent in Spanish and so there is nothing in the record to suggest that the Defendant did not understand the questions asked by Deputy Armijo. The encounter took place on busy a highway in public view; Defendant's documents were promptly returned to him; Deputy Armijo said "have a nice day," signaling Defendant was free to leave; Defendant had an unobstructed walk back to his car; and Deputy Armijo waited until Defendant returned to the rear of his car when he asked if they could continue speaking to which Defendant responded, "Si." The United States has met its burden of establishing that Mr. Figueroa-Rivera's consent to the continued detention was voluntary.

      b. <u>Deputy Armijo Possessed Reasonable Suspicion Justifying Continued Detention</u>

Even if Mr. Figueroa-Rivera did not consent to Deputy Armijo's further questioning, the Court finds Deputy Armijo had reasonable suspicion to continue the detention and questioning.

A traffic stop "may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. White*, 584 F.3d 935, 949 (10th Cir. 2009) (internal citations and quotations omitted). "Officers … need not even assert a 'fair probability' that their investigation will actually turn up evidence of criminal activity." *United States v. Lopez*, 518 F.3d 790, 799 (10th Cir. 2008) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

11

Defendant claims the totality of the circumstances do not give rise to reasonable suspicion.  At the hearing, Defendant argued individuals are free to drive at any time of the night and are free to choose their own travel routes, regardless of how nonsensical they may be.  Defendant further emphasized that it is not illegal to drive a vehicle insured under another's name.  The Court does not necessarily disagree with these contentions.  However, Defendant completely ignores the litany of other factors giving rise to Deputy Armijo's suspicion that criminal activity was afoot, which arose from the initial traffic stop and continued until Deputy Armijo returned Defendant's documentation.  Deputy Armijo testified at length regarding Defendant's nervousness and inability to maintain eye contact; the discrepancies regarding the vehicle's insurance and ownership; Defendant's unusual travel plans; the timing of his itinerary; and the obvious indication that the vehicle's undercarriage had recently been modified.[5]

The United States cites *United States v. Bradford*, 423 F.3d 1149 (10th Cir. 2005), which involved factual circumstances similar to this case.  In *Bradford*, the defendant was pulled over for various traffic violations.  *Id.* at 1153.  The officer noticed defendant was extremely nervous.  *Id.*  Additionally, the defendant made multiple inconsistent statements regarding her travel plans and was unable to answer the officer's most basic questions.  *See id.* at 1154.  The officer suspected she was trafficking drugs, and called for a canine unit to search her vehicle.  *See id.*  The officer ultimately located nearly five kilograms of cocaine in the trunk of the vehicle.  *See id.* at 1155.  The Tenth Circuit emphasized that while each factor regarding defendant's behavior "when standing alone" might have been innocent, "the totality of the circumstances" illustrated that the officer had an objectively reasonable basis for suspecting criminal activity was afoot.  *Id.* at 1157.  The defendant's "answers to basic questions were evasive and conflicting at best, and

---

[5] It is well established that evidence of a hidden compartment can contribute to probable cause to search.  *Alcaraz-Arellano*, 441 F.3d at 1261.

12

the story she told defied common sense." *Id.* Similarly here, Defendant's behaviors taken individually may very well have been innocent. But given the totality of the circumstances including Mr. Figueroa-Rivera's incessant nervousness, implausible explanations and inconsistent statements, and the low-hanging exhaust system, Deputy Armijo possessed reasonable, articulable suspicion that Defendant was engaged in criminal wrongdoing.

The United States has met its burden of establishing that Deputy Armijo possessed significantly more than a mere hunch justifying the continued detention and questioning of Mr. Figueroa-Rivera.

      c.  <u>Deputy Armijo Possessed Reasonable Suspicion to Deploy the Canine, and the Canine Search Was Supported by Probable Cause</u>

Finally, Mr. Figueroa-Rivera contends the canine search of his vehicle was unlawful because it was not supported by reasonable suspicion to deploy the dog or probable cause to conduct the search. The United States responds that Deputy Armijo had a legal basis to utilize the canine search despite Defendant's non-consent because at that point, the Deputy already had reasonable suspicion that Defendant was engaged in criminal activity.

The Court has already found that Deputy Armijo had reasonable suspicion of criminal wrongdoing by the time Mr. Figueroa-Rivera declined consent to the canine search. *See* Section II.b, *supra*. Deputy Armijo and Deputy Rael thus had a legal basis to deploy the canine to conduct an open-air sniff of the vehicle. *See Moore*, 795 F.3d at 1229. The dog alerted to the rear of Defendant's vehicle, giving rise to probable cause to search the entire vehicle. *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993) (a canine alert outside the trunk of a vehicle creates probable cause to search the inside of the trunk for drugs). The United States correctly argues it had probable cause to search the car due to the dog's positive alert, thus the search that located the hidden cash was constitutional. "If probable cause justifies the search of a

lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).

The United States has met its burden of establishing that the traffic stop, continued detention, and the canine search of Defendant's vehicle were constitutionally sound, so there is no basis to suppress the evidence discovered pursuant to the search of his vehicle. Accordingly, for the reasons set forth in this Memorandum Opinion and Order, Defendant's Motion to Suppress (**Doc. 28**) is DENIED.

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE